# EPPERSON v. POSTAL TELEGRAPH CABLE COMPANY, Appellant.

## In Banc, March 27, 1900.

1. **Sufficiency of Petition:** PLEADING OVER AFTER DEMURRER: WAIVER. The question of the sufficiency of a petition to state a cause of action is not waived, though defendant pleads over after the overruling of a demurrer to the petition, in view of Revised Statutes 1889, section 2047, providing that an objection that the petition does not state facts sufficient to constitute a cause of action shall not be deemed to be waived by a failure to demur.

2. **Employment:** ASSUMPTION OF RISK: PLEADING. An employee trying a case against his employer for injuries incurred in the course of his employment, on the theory that it was incumbent on him to show that he did not assume the risk, can not, on appeal, first object that the employer failed to plead that he had assumed the risk.

3. ———: ———: FOREMAN'S ASSURANCE: CASE STATED. An experienced lineman, employed to attach wires to poles, felt a current in the wire, and informed his employer's foreman that the wire was too strongly charged with electricity to be handled with satisfaction, whereupon the foreman felt of the wire, and assured him that it was safe. The lineman then climbed a pole, and again felt the current, but made no further complaint, and continued his work until injured by a shock from the wire. *Held*, that a recovery on the ground that he relied on the foreman's assurance was not sustained.

4. ———: ———: ELECTRIC WIRES: LINEMAN: LIGHTNING. A lineman is not entitled to recover of his employer for injuries caused by a shock from a wire that he was handling, where the evidence shows that the probabilities are equally strong that the shock was caused by lightning as by the induction of currents in the wire for which the employer would be responsible.

BY GANTT, C. J., IN SEPARATE OPINION.

**Tools:** MASTER'S KNOWLEDGE AND DUTY: SERVANT'S KNOWLEDGE. The master's liability is not excused if he had no knowledge of the defects in the appliances furnished his employee for the performance of his work. It is his duty to furnish the servant a reasonably safe place in which to work, and reasonably safe appliances, and he is liable for injuries to him from his failure to do so, both for the

defects of which he had actual knowledge and those latent defects which by the exercise of ordinary care he could have discovered, and he must use reasonable care to see that they are safe and suitable for the work to be done and to keep them in that condition. Nor will the master's neglect to supply the proper appliance be excused by the servant's knowledge of their defects. It is also the duty of the employer to use every reasonable precaution to insure the safety of the servant engaged in a hazardous employment. On the other hand if the appliance is so obviously and immediately dangerous that a man of ordinary prudence would refuse to use it, the master can not be held liable for the resulting injuries, for then the servant is guilty of concurrent negligence.

Appeal from Jackson Circuit Court.—*Hon. E. L. Scarritt,* Judge.

REVERSED.

*Gage, Ladd & Small* for appellants.

(1) Under all the circumstances of this case the evidence affirmatively shows that the foreman was not only guilty of no negligence in inspecting the wire, but that he exercised extraordinary care in so doing before he ordered the plaintiff to ascend the pole. Defendant was not bound to adopt a system of inspection which would absolutely insure plaintiff against injury. In any event, plaintiff knew what inspection had been made, and he made no objection to it, therefore, as to him, the inspection was not negligent. Flood v. W. U. Tel. Co., 131 N. Y. 603. (2) The negligence, if any, of the defendant's foreman in inspecting the wires, had nothing to do with the accident. (a) Because the evidence shows that as a matter of fact, there was no current on the wires when the foreman examined them and so informed the plaintiff, consequently the most diligent inspection on his part could not have discovered the current. Essex v. Kelley, 29 Atl. Rep. 427. (b) There is no claim in the petition and no evidence to prove that the current which injured the plaintiff got upon the wires through any negligence or fault of the

defendant, and the court so instructed the jury. Therefore, it must have got upon the wires through the fault of some third person or from lightning. Searle v. Railroad, 101 N. Y. 661; Breen v. Cooperage Co., 50 Mo. App. 202; Baltimore & C. R. R. Co. v. Reaney, 42 Md. 117. (c) The real cause of the accident was the dangerous current on the wire. That is what injured the plaintiff. That was the proximate cause. There was no defect in the construction or operation of the defendant's plant, and the current was not brought upon the wires through any fault or negligence of the defendant, and the court so instructed the jury and they must therefore have so found. Therefore, the current which injured the plaintiff must have arisen from a pure accident, or from the act of God, or the fault of a third party. In neither event was defendant liable.

*Wash Adams* and *N. F. Heitman* for respondent.

(1) Knowledge on the part of the defendant, of the presence in the wires of the unusual and dangerous intermittent current of electricity, cast upon the defendant the duty of exercising ordinary care, to the end that plaintiff, its servant, should not be exposed to the danger of handling these wires, while it was reasonable to suppose this dangerous current might be present or recur therein. The master must not only use reasonable care in furnishing his employes safe appliances with which to perform their duties, but he must also use reasonable care in keeping them in repair and in safe condition. Parker v. Railroad, 109 Mo. 392; Gutridge v. Railroad, 105 Mo. 525; Parsons v. Railroad, 94 Mo. 282; Gardner v. Railroad, 150 U. S. 349. (2) If the master orders the servant into a situation of danger and he obeys and is thereby injured, the law will not deny him a remedy against the master on the ground of contributory negligence unless the danger was so glaring that no prudent man would have

entered it even when like the servant, he was not entirely free to choose. Keegan v. Kavanaugh, 62 Mo. 230; 2 Thompson on Neg., 975; Shortel v. Joseph, 104 Mo. 114; Stephens v. Railroad, 96 Mo. 212; Hamilton v. Rich Hill Mining Co., 108 Mo. 364; Aldridge v. Furnace Co., 78 Mo. 565; Warner v. Railroad, 62 Mo. App. 190; McGowan v. Railroad, 61 Mo. 532; Southwest Sel. Co. v. Woughton, 56 Ark. 206; Lee v. Woolsey, 109 Pa. St. 124; Illinois Steel Co. v. Schymanowski, 44 N. E. Rep. 879. (3) An assurance from one representing the master that the machinery or apparatus being used is all right, and an order from him to the servant to use it, notwithstanding the complaint of the servant as to its sufficiency amounts to a guaranty of safety and the master will be liable for any injury then resulting from its use. McGowan v. Railroad, 61 Mo. 528; Rowland v. Railroad, 20 Mo. App. 463; Warner v. Railroad, 62 Mo. App. 191; Aldridge v. Furnace Co., 78 Mo. 559; Monahan v. Coal Co., 58 Mo. 680; Keegan v. Kavanaugh, 62 Mo. 230; Stephens v. Railroad, 96 Mo. 207. (4) Although the servant knows of the dangerous condition of the appliance, yet if he reports it to the master and the master promises to remedy it, the servant is justified in continuing its use relying on such promise. Conroy v. Vulcan Iron Works, 62 Mo. 35; Flynn v. Railroad, 78 Mo. 195; Holloman v. Iron & F. Co., 133 Mo. 480. (5) The risks assumed by the servant do not include such as result from the neglect of the master to discharge his personal duties. Henry v. Railroad, 109 Mo. 493; Gardner v. Railroad, 150 U. S. 549. (6) Mere knowledge of the servant of the danger does not preclude recovery—such knowledge is only an element of evidence to be considered by the jury. Omellia v. Railroad, 115 Mo. 205; Warner v. Railroad, 62 Mo. App. 190; Stoddard v. Railroad, 65 Mo. 514; Delvin v. Railroad, 87 Mo. 545; Huhn v. Railroad, 92 Mo. 440.

SHERWOOD, J.—Action for $10,000 damages for injuries received while acting as lineman for defendant corpora-

tion, and through alleged negligence of defendant. The cause was tried on the first count in plaintiff's petition which is nearly seven printed pages in length, and, in substance, the following: That defendant, a corporation, was proprietor of, operating and constructing a line of telegraph from Chicago, Ill., to Indianapolis, Ind.; that such line was operated by means of wires stretched on poles, and a large gang of men was employed for the purpose of constructing such line, plaintiff being one of the number, and his duty being to climb poles and stretch wires; that Terwilliger was in charge of the gang of men, acting as foreman; that when within a few miles of Indianapolis, and on the 28th of September, 1891, the foreman negligently and carelessly commanded plaintiff to take the wires so being stretched, ascend the pole and attach the wire to the pole, on which were other wires stretched; that the foreman knew, at the time of giving such command, or by the exercise of ordinary care might have known, that the wire plaintiff was ordered to ascend the pole with was in a dangerous condition by being charged with a dangerous intermittent current of electricity; that the carrying of such wire up the pole and attaching it, etc., would greatly imperil the life or limbs of plaintiff; that the wire thus being strung by the gang employed for the purpose was, and ought to be, a dead wire, without any current of electricity in it, and was expected by the members of such gang to be in that condition; that on the date aforesaid plaintiff observed an unexpected current of electricity in said wire, the existence of which in said wire was contrary to the ordinary course of plaintiff's employment of stringing a new wire through the country, and the risk arising from the existence of such current of electricity in said wire was a risk not ordinarily incident to the employment in which plaintiff was engaged in the stringing of such wire; that on one occasion, on the morning of the day mentioned, plaintiff observed the unexpected current of electricity in said wire, and, notifying the foreman of it, was told

by him that if he noticed the existence of the current again he should notify him about it, and the latter would take steps to find out what the trouble was; that on the same morning, having again noticed the current of electricity in the wire, he again notified the foreman of that fact; that the foreman negligently failed to ascertain the cause of the existence of the current in the wire, and to protect plaintiff against such unusual danger; that just before plaintiff started up said pole, having handled the wire all day, only feeling the current of electricity at intervals, he again noticed that the current of electricity was in said wire, and complained to the foreman that "said wire was too strongly charged with electricity to be handled with satisfaction;" that thereupon the foreman picked up the wire, held it in his hands, said he felt nothing in it, and thereupon negligently and carelessly assured plaintiff the wire was all right, and ordered plaintiff to go ahead with his work; that plaintiff, relying on this statement of the foreman, and being lulled into a sense of security thereby, went up said pole in obedience to said order; that after being notified of the intermittent current of electricity in said wire, it became the foreman's duty to investigate and find out the cause of such wire being charged with electricity, etc.; that the foreman did not perform such duty in a careful manner, but negligently failed to do so, after being notified, etc.; that it was also the duty of the foreman to remove the cause of the existence of such current of electricity in said wire, which he could have done by cutting the wire behind the places where plaintiff and other climbers were at work; that this duty, also, defendant negligently failed to perform; that pursuant to the order aforesaid, negligently given, plaintiff, with the wire in his belt, mounted the pole; that when about thirty feet above the ground, while endeavoring to fasten the wire, by means of other wires, to the cross timbers on the pole, he received a shock of electricity from said wire; that it robbed plaintiff of consciousness, and caused him to fall heavily to the ground,

etc., to his damage, etc.; and that this result was produced by the negligence of defendant, as aforesaid. It will be noticed that there is no charge in the count in question that defendant was guilty of any negligence in constructing its line, or that there was any defect in any portion of defendant's electrical apparatus; nor that the electricity by which plaintiff was shocked got into the wires through any negligence of defendant. The only negligence charged consists in the statement that Terwilliger, defendant's foreman, was guilty of negligence in ordering plaintiff to ascend the pole, and proceed with his work, stringing the wires, when knowing, or negligently failing to know, that they were occasionally charged with an intermittent current of electricity, which was dangerous; and that Terwilliger negligently failed to remove the cause of the existence of the current of electricity in the wire by cutting the wires behind the workmen then engaged in stringing the same.

1. Defendant demurred to this count, but on what grounds is not stated. The count was, however, adjudged sufficient, and defendant pleaded over. Notwithstanding this, the fundamental sufficiency of a petition always remains an open question, and this under a statutory provision announcing that, if the petition "does not state facts sufficient to constitute a cause of action, that such objection shall not be deemed to be waived;" and section 2047, Revised Statutes 1889, places the failure to state facts, etc., on the same plane as the lack of jurisdiction over the "subject-matter of the action." [Sweet v. Maupin, 65 Mo. loc. cit. 72, and other cases.] The question of the fundamental sufficiency of the petition being thus an open one, it will now be examined. As before stated, the action is bottomed exclusively upon the negligence of the defendant. When this is the case, the action being that of a servant against his master, for injuries received in consequence of defective machinery, premises, material or other instrumentalities provided for the prosecution

of the work, the servant must allege and prove, not only that the danger or defect was known to the defendant, but was unknown to plaintiff, and any statement of claim which does not include both of these allegations of fact discloses no cause of action, and is, consequently, fatally defective. This is the rule announced in the leading case of Griffiths v. Dock Co., 12 Q. B. Div. 493. In speaking on this subject, DAY, J., said: "The old form of declaration in such a case alleged that the danger was known to the master and unknown to the servant. That seems to me a reasonable form of alleging a cause of action. If either of those allegations is omitted, I think there is no cause of action. If a master employs a servant to do work for him, not knowing of any special or latent danger in the work, the servant takes the consequence of any danger there may be in it. The master does not mislead the servant, but only avails himself of his voluntary service. On the other hand, if the master knows of danger which the servant does not, it is clearly the duty of the master to communicate his knowledge of the danger to the servant. If the master requires the servant to do something out of the ordinary course of his employment and dangerous, the servant may disobey him. It is clearly the duty of the master to communicate a danger which he knows, and which the servant does not. It is necessary to allege that the servant does not know of the danger because, if the servant knows of the danger, and does the act which may and does cause injury to him, he has nothing to complain of, and can not bring an action for the damage sustained. He may be justified in declining to perform a particular act, not in the course of his employment; but, if it is in the course of his employment, he undertook to do that dangerous thing." This judgment was afterwards affirmed on appeal (13 Q. B. Div. 259), and on that occasion BRETT, M. R., said: "The question is whether a *prima facie* cause of action is shown in the statement of claim in this action. Now where it is an action by a servant against his master for the wrongful

condition of machinery on the premises on which the servant is to act, or of the condition of the means by which the services of the servant are to be fulfilled, if the servant confines the allegations in his statement of claim to alleging the existence of danger in any of these things, owing to the negligence of the master, he shows no cause of action. That was decided many years ago by Priestley v. Fowler, 3 Mees. & W. 1. If the danger is one which was known to the master and not to the servant, the knowledge of the master and the want of knowledge of the servant make together a cause of action, and as it is necessary that these two things should exist in order to form a *prima facie* cause of action, it is necessary that they should be shown to exist in the statement of the claim." See, also, to like effect, Bogenschutz v. Smith, 84 Ky. 330, and cases cited; Buzzell v. Manufacturing Co., 48 Me. 113, and cases cited. In the present instance, the petition, while alleging knowledge, or the means of knowledge on Terwilliger's part, nowhere alleges a corresponding ignorance on plaintiff's part, thus constituting a defect in the petition of the character before mentioned. These observations are, however, but the expression of my individual views. So much for the petition. The answer was a general denial and a plea of contributory negligence.

Among the instructions asked by, but refused, defendant, was one in the nature of a demurrer to the evidence. The refusal of this instruction necessitates the giving of the substance of that evidence, and in some instances of giving it literally. Plaintiff, an experienced lineman, who had been in the service of defendant corporation stringing new telegraph wires from Chicago to Indianapolis, and had worked as lineman in cities and towns off and on for the space of some two and one-half years, was one of the gang employed during the months of August and September, 1891, to string wires between the terminal points aforesaid; Terwilliger being foreman of the gang which left Chicago in August, and pro-

ceeded on its way towards its ultimate destination. They started stringing five new wires at cable house in Chicago. At Myrtle avenue they dropped two, and went on from there with three wires to Indianapolis—a road wire, field wire, and bracket wire. 'The wire next to the public road was the road wire, the one next to the fields the field wire, and the one on the bracket was the bracket wire. There were a great many wires on the poles besides those they were putting on—about twelve. They were on cross-arms above the wires then being strung. They strung the road wire and field wire on the lower cross-arm, on which there were two wires already strung. The wires strung by them were mostly over those of the Western Union Telegraph Company. The gang crossed those wires at nearly every railroad crossing that they encountered on their route, and in the suburbs of Chicago, and every little town they passed through where there was a railroad. They also crossed over trolley wires at Lafayette, Ind., where there was an electric plant, where the trolley wires were under the wires of defendant, and where there were telephone and electric wires as well as those of the Western Union. These crossings of defendant's wires crossed over the other wires mentioned three, four, or five times while passing through Lafayette. The trolley wire is always heavily charged with electricity, and in Lafayette the trolley wire was some ten feet below defendant's wires, and the electric light wires some twelve or fifteen inches from defendant's wires at that point. Defendant's wires also crossed the electric wires at Crawfordsville, Ind., three times, and the Western Union twice. On the morning of the 28th day of September, 1891, about 9 o'clock, when they had reached a point in the country about seven miles northwest of Indianapolis, the plaintiff noticed a current of electricity in the wires while handling them, and said to the foreman "that there was either a cross up with some wires, or they had turned the current on us." That thereupon the foreman said: "It is about time they

were getting to their offices, and very likely they are feeling for us"—meaning the operators in charge of the Chicago office—"and, if you feel it any more, let me know it, and I will send a man back to see where the trouble is." That he then proceeded with his work. About 11 o'clock plaintiff again felt a current, and when the foreman came along he called his attention to it. The foreman passed on, and said nothing, and the plaintiff kept on at work until noon. Nothing was said or done by plaintiff or the foreman. Plaintiff and the rest of the gang went to work after dinner as usual, and about 4 o'clock all hands quit, and went to a spring to get a drink, and while there plaintiff and other linemen were talking among themselves, in the hearing of the foreman, to the effect that there was a current on the wires, but no one said or thought it was dangerous. But it does not appear that any current had been on the wires since 11 o'clock in the morning; at least plaintiff testifies that there was not. After getting a drink at this spring, they all went back to their places to work, there being four climbers, including plaintiff. Plaintiff's pole was in front, nearest towards Indianapolis, Kaiser's was next, Vincent third, and Scott was last. Each one started for his pole, the poles being about 150 or 175 feet apart. On leaving the spring, the foreman, Terwilliger, accompanied the plaintiff to his pole. When plaintiff reached his pole, he picked up the wires, put them in his belt, which had a hook on it to hold them, and started up, and when he had ascended three or four feet he got a shock from the wires, and threw them down, and descended from the pole, and said to the foreman, who was standing near, "These wires are too d——d hot to handle with any satisfaction," and that "he would not handle them any more until Chicago quit feeling for him." When plaintiff threw the wires on the ground, they lay on the ground to within a few feet of Kaiser's pole, who had not yet ascended it, and were also lying on the ground a long distance towards Indianapolis—about three hundred yards, to

where Bell, the slack puller, was located.   The wires, there-
fore, must have been on the ground on both sides of the
plaintiff's pole when he received a shock above referred to, as
he got the shock when he had ascended the pole only three
or four feet, and he was, therefore, not high enough from the
ground to raise the wires off the ground back as far as Kaiser's
pole, or as far away as the slack puller, and the other climbers
had not yet ascended their poles and lifted the wires off the
ground.   As soon as plaintiff threw down the wires with the
above remarks to the foreman, the latter immediately walked
up to where the wires were lying, and picked them up in
his bare hands, and held them for a few minutes, and then
dropped them, saying:   "Tom, I don't feel anything on these
wires.   They are all right.   Go ahead."   Plaintiff was then
ten or twelve feet away from the foreman.   Plaintiff saw
the other boys going up their poles, and then picked up the
wires again, and started up his pole, but he says, "I don't
know but what I would have picked them up before if they
had not started."   When he picked up the wires this time, he
felt nothing in them.   He put them in his belt, and carried
them up to the top of the pole, and felt nothing until just
as he reached the cross-arm, where he intended to place the
wires.   Then he felt the current again while the wires were in
his belt, before he attempted to take them out, and also when
he took them out of his belt with his hands, and threw them
to their places on the bracket and the cross-arm.   Notwith-
standing this fact, he proceeded without saying anything more
to the foreman, took the wires out of his belt, threw them
over the cross-arm and bracket, tied the field wire, and, when
starting to tie the road wire, received a shock which knocked
him off the pole, thereby injuring him.

    In his deposition, which defendant read as an admission,
the plaintiff on this point testified as follows:   "Q.   Well,
after Mr. Terwilliger had thrown these lines down, saying he
felt nothing, you took them up of your own notion?   A.   I

took them up when he said they were all right. Q. You just picked them up, and you felt nothing the matter with them? A. Not at the very instant I picked them up. Q. And you did not feel anything until you got that shock handling them up on the poles? A. Yes, sir; I did. Q. Before you got that shock? A. Yes. Q. When did you first feel any electricity? A. When I was placing them. Q. You kept right on then, knowing that they were charged with electricity? A. When I would feel it, I would know it was a current. Q. Well, you felt it then when you were placing them on the pins on the poles? A. Didn't I state that? . Q. I want to know if I understand you correctly. And still you kept right on handling these wires, and attempting to tie them? A. I went ahead with my work as I was instructed. Q. Well, do you swear now, then, after you found, when you were placing them, that they were charged with electricity, did you call out to Mr. Terwilliger, and tell him that you wouldn't handle those wires, that they were alive, or say anything about it? A. Not while I was on the pole; no, sir. Q. You proceeded to handle them knowing them to be charged with electricity, and did tie one, and then proceeded to tie the road wire, and then, while attempting to tie that, you got a shock that knocked you off the pole, is not that so? A. Yes, sir." Plaintiff's testimony also shows that he was an expert at the business, and knew all about it—its dangers and the consequences thereof, and the way to prevent the same. He testified, over defendant's objections, that the way to have prevented the accident was to have cut the wires, which he admits he knew was not done, or even suggested, either by himself or the foreman. Plaintiff knew that when the foreman picked up the wires and examined them, and said that there was no current in them, that the wires were lying on the ground for some distance on both sides of the foreman, yet plaintiff says that he knew that in such circumstances nothing could be felt in the wires if there had been a current in them. Plain-

tiff failed to make any complaint of the sufficiency of the fore-
man's examination.   He further testified:   That in repairing
or reconstructing lines the linemen always handle the wires
with the telegraph current on, but in stringing new wires in
the country, the new wires are supposed to be dead.   In
handling old wires, linemen are constantly looking out for it,
because they have notice that it is in the wires, and there is
nothing alarming about it.   That he knew these wires were
alive before the accident, but did not think the current was
dangerous.   A live wire is a wire that has a current of elec-
tricity in it; a dead wire is one that has no current.   That the
feeling current is not dangerous, and is even a little lighter than
the ordinary telegraph current, as he had always found—not
pleasant to handle, but not dangerous.   A feeling current
means that they are testing to see if you have the wires up to
the office which you are going to.   That he thought the cur-
rent he had felt on the wires was a feeling current.   He told
the others so.   Terwilliger told him he thought it was a feeling
current, and he told Terwilliger the same thing.   So far as
he knew, all that the foreman knew as to the kind of current
that was on the wires was what he (Epperson) told the foreman.
Nobody said there was any dangerous current.   The only
difference in repair work and putting up new wires is that
in repair work a lineman knows the wires are alive, and expects
the current, and can guard against it, and in new wires it
is unexpected; but in this instance he did have notice of the
current.   He had felt feeling currents before.   In stringing
new wires they frequently swing up among the live wires on
the poles, and a lineman gets a shock that way very frequently.
The day plaintiff was hurt was very hot and sultry, and plain-
tiff's clothes, and even socks and shoes, were wet with sweat,
and he was therefore more liable to get shocked than if they
had been dry, as he knew.   The old wires on the poles,
among which he was working, were supposed to be alive.
There were two live wires on the lower cross-arm, on which

he was stringing the new wires. The wires all the way from Chicago, were strung in a good, safe, careful, workmanlike manner by himself and the rest of the men; and, so far as he knew, none of them broke or fell on any of the trolley, electric light, or other wires over which they crossed. Plaintiff further testified, over defendant's objections and exceptions, that on the route from Chicago, at several points, the wires which he had strung crossed over telegraph lines, electric light and trolley wires, and he also testified as to the manner of stringing the wires, the character of the poles on which they were strung, and generally described the line on which he had been working, and its condition. Plaintiff knew all about the construction and condition of the line he was working on, and never made any complaint or objection to it. But there was nothing in his or any other testimony in the case to show that there was any negligence in the construction, or maintenance, or operation of the line, or wires, or other apparatus of defendant; and the court instructed the jury that the defendant was not guilty of any negligence or fault whatever whereby the electricity which injured plaintiff got upon the wires. Plaintiff also testified, in answer to the question, "What did you rely upon when you went up there?" (referring to the pole at the time of his injury), "I relied upon his [the foreman's] words being all right."

Grayson testified: "There is a great deal more danger from crosses with electric light wires than telegraph wires. If telegraph wires get crossed with electric light or trolley wires, the telegraph wire has to carry the current of the electric light or trolley wire. Swinging crosses are occasioned by wires falling down or becoming slack. Would not cut or snub telegraph wires if I thought, or had been told, that there was simply a current on them from a telegraph dynamo battery. Telegraph wires are always alive when being repaired or changing an old line into a new." This witness also testified, over defendant's objection, that, if a man under him had

complained that the wire was too hot to handle with satisfaction, he (the witness) would have cut the wires, and would not have run into any more danger—would not pick them up himself to see.

Loring testified: "When stringing new wires in the country, the wires are usually supposed to be dead, but in repairing and handling wires in a city or town they are supposed to be handling live wires. Telegraph current, either from dynamo or battery, is not ordinarily dangerous, even though men come in contact with lightning rods on poles while handling wires charged with such current. While repairing or reconstructing telegraph lines, wires are usually charged. Feeling current is same as ordinary telegraph current. In repairing old lines, current is on all the time, but in putting up new lines only occasionally, when feeling, when the work is getting through; and there is more danger, for that reason, of getting hit with electricity in repairing old lines than in putting up new ones."

Bloss testified: "Electrical currents get in dead wires by contact with live wires—by being blown against them by the wind, or other causes. Feeling is sending a current over the wire to see where it ends. Feeling would not knock a man off a pole, or unsteady his action. If a person is wet with sweat, and comes in contact with lightning rods on a pole, he is more liable to get shocked than if dry. A feeling current is not generally as strong as an ordinary telegraph current. Linemen habitually work with the wires when full telegraph current is on, in repairing the wires. It is part of their business to do so. Feeling current in new wire is the same current that is in old wires which linemen handle when repairing. Currents on new wires might come from feeling, from crosses with other live wires, or from lightning. It is customary to send out feeling currents occasionally when men are stringing new wires, to find out how far they have got; and linemen understand that. Live telegraph wires are not dangerous, but

electric light wires are. If wire is too hot to handle, that would indicate it was not a feeling current. When telegraph wires are put up over electric light wires, it is possible they may sag down, or slip off, and fall on them, but it is not ordinarily to be expected. If telegraph wire gets too hot to handle with satisfaction, that would indicate contact with some highly-charged wire; that it is in extremely dangerous condition; apparently dangerous for any one to handle; dead sure to work an injury. Current which injured plaintiff might have got on wire from lightning, or cross with highly-charged wires."

Frank Burns testified that he got hurt once, and was therefore more cautious than he otherwise would be. "Ordinarily no danger at all from live telegraph wire, especially so if man holding wire is standing on telegraph pole, or anything that keeps him off the ground, even though one end of wire is on the ground. If a man's clothes are wet with sweat, he is more liable to get shocked. In order to get shocked, there must not only be a current on the wire you are handling, but you must at same time come in contact with the ground, either directly or indirectly, by touching another wire which is connected with the ground, so as to complete the circuit. Feeling currents are not considered dangerous, even though you are grounded."

McQuire testified: "Could not tell positively, by picking up wire, standing on ground, whether there was electricity in it or not. It depends on circumstances. If wire was completely grounded in front of me, electricity would go off in the ground. Or ground might be so dry as not to draw off the electricity. But I would not pick up live wire. I never acted as foreman for telegraph company. The current from a telegraph battery and dynamo are the same—no difference. Even if a live wire was lying on the ground on both sides of me, I would not pick it up. If it was charged with low electric motor, and grounded from me, I probably would not

feel it.   But I would not pick it up.   Yet the fact that I could not feel it would not be positive proof that it was not there.   If I was standing on dry dirt, or something that insulated me from the ground, I wouldn't feel the current, but, if standing on moist ground, I might get a shock.   If a man is in a dry condition, and stands upon dry ground, and picks up a live wire which lies well on the ground, it depends upon the electric motor force in the wire as to whether he could feel the current.   If of high voltage, he could; if of low voltage, it is altogether different.   It would not be a proper test to determine whether there was any electricity in the wires.   I never was a foreman for a telegraph company, but I have worked with them, mainly because under that head is all electrical business.   The telegraph current, whether produced by a dynamo or a battery, is the same.   Linemen handle live telegraph wires every day in doing repair work, but it depends on circumstances in stringing new wires.   Judge, they don't work on live wires unless they are notified of the fact the wire is alive.   But they do work on live telegraph wires.   Telegraph wires are not as dangerous as electric light wires, because the telegraph current is very low—it is a very small quantity."   He also was asked the following question by plaintiff's counsel:  "What would be the usual method of obviating a difficulty on an occasion of that kind?" to which defendant duly objected, and his answer was, "By going back and cutting the wire."

Jones testified:   "If a telegraph line comes in contact with an electric light or trolley wire, it becomes charged with the electric light or trolley current.   Linemen work right along with live telegraph wires in repairing and handling the lines.   They do not cut them or disconnect from the dynamo or battery."   In answer to the following question of plaintiff's counsel, to which defendant objected:   "What could have been used whereby he [meaning defendant's foreman] could have told whether there was a current in that wire that was

too strong—whether it was a dangerous current?" this witness said that "electric light companies had a volt meter by which the strength of the current could be ascertained."

On behalf of defendant the testimony was the following:

Terwilliger testified: "Was foreman of gang from Chicago to Indianapolis. The bracket wire was strung on a bracket on the poles about eighteen inches below the lower cross-arm, on which the road and field wires were strung. It is always customary to keep the telegraph current on when linemen are handling wires in repairing and reconstruction, and adding new wires to old pole lines is a species of reconstruction or repairing. It was Epperson's business all the way from Chicago to climb the poles and tie the wires on. Generally had four or five climbers, and a man or two to clean up—that is, men to loosen the wires from the fence, brush, or other things they would get caught on, so that the climbers would not have to come down off the poles to loosen them. The climbers carried the wires up the poles on hooks in their belts. Also had a wagon to carry wire on ahead. Also had men ahead with the reel—sometimes two. It was a usual thing for linemen to get shocks from the wires. Epperson never said anything that day—in the morning, or about 11 o'clock, or any other time—about currents in the wires until we got to pole after going to the spring in the afternoon. When Epperson returned from the spring, and threw the wires down, saying, 'They were too d——d hot to handle with satisfaction,' and 'he wouldn't handle them any more until Chicago quit feeling for him,' witness picked them up in his bare hands, and held them a short time, and felt nothing. Thereupon he threw them down, and simply said, 'Tom, I don't feel anything in these wires now.' He did not add, 'They are all right; go ahead.'" On this point Terwilliger testifies as follows: "I walked up to the pole, and picks up the wires, and held them for a few seconds, and I didn't feel anything, and I threw them down, and I turned

around to him, and I said: 'Tom, I don't feel anything on these wires now.' I kind of looked back then, and saw the other men going up to the poles, and I just started ahead to Bell, the slack puller; and Epperson, he walks up, and he picks the wires up, and he put them in his belt, and he carried them up the pole, and I walked from him with my back towards him; and I had a wire in each hand, holding them up like this (indicating) as he went up the pole. Of course, he carried them higher all the while as he went up the pole. As he went up from me the wire was about the same height from me. I walked a few steps in that position. I had the other wires—two wires in my left hand, and one in my right, sliding them through my fingers that way (indicating) for a distance of twenty, thirty, or forty feet, and I did not feel anything. I let loose of them. I never turned around, but kept walking towards Bell, and I had not gone over twenty or thirty feet after I let loose of the wires until Bell says, 'There goes Tom,' or 'There goes Slowfoot,' a kind of a nickname that the boys had for him. I just whirled around in time to see him strike the ground. I was the first man to him after he was on the ground to take hold of him." From what Epperson said, witness supposed Chicago might be testing—sending out light current. "Scott, who was on pole tying behind, got knocked off at same time Epperson did, and was injured a little. After we sent Epperson in wagon to hospital, we put the wires up on the poles until we reached the wagon, which was about a quarter of a mile ahead, and it was then time to quit, and we snubbed up the wires, and went to Haughville, a suburb of Indianapolis, where we stopped that night. Where the accident occurred was about seven miles from Indianapolis the nearest telegraph station. Did not cut the wires before Epperson was hurt, because it was something I had never known to be done in this country. Lots of times the men would get little shocks from the wires they were stringing swinging up and striking

the live wires on the poles, but we never cut or deadened the wires. That is never done except in very high altitudes, like Colorado, where the electricity in the air is very strong and noticeable. At the time Epperson got hurt, I did not notice any electricity in the air, but shortly afterwards I noticed a little cloud hanging in the northwest—not enough to hide the sun—and about 7 or 8 o'clock we had a very, very heavy thunderstorm. Lightning will travel a long way on a telegraph line, and it is a very common thing for it to get on the wires in the time of storms. The wires were all well strung, and I never heard of their being crossed with any of the electric light, trolley, or any other wires we went over. We crossed over them pretty high—from two to ten feet. Electric light wires are not generally alive in the daytime, as the lights generally burn only at night. It is not customary to cut the wire when a lineman gets his fingers burned, and complains, as Epperson did. I could have made no better examination than I did. The other boys picked up the wires about the time Epperson did. After I had examined them, and after he started up the pole, I kept them in my hands over my head, walking towards the slack puller, and felt nothing, although I held them with my bare hands. The two climbers in the swing—that is, on the poles between Scott and Epperson —did not get any shock. I suppose they were not so fast, and did not get hold of the road wire at the time Scott and Epperson did. I did not have a chance to send a man back at the time Epperson was hurt, because the boys had already started up the poles with the wires, and were making the tie. I carried the wires over my head, in my hands, after Epperson went up the pole, until I had gone far enough to convince myself there was nothing in them. The wires were not on the ground back of me then (i. e. towards Chicago), but only in front of me (i. e. towards Indianapolis). I was in the most dangerous position. It was the first ground that any current would strike. An intermittent current is not very

long. You catch it sometimes, and then you don't. A feeling current is intermittent—comes at intervals, off and on." Defendant's counsel asked witness whether it was usual, when linemen got their fingers burned a little, and made complaint, such as was made by Epperson to him, to quit work, and call all the hands off, but the court refused to allow the witness to answer, although plaintiff's witness Burns had expressly testified that that is what he would have done, and is what the foreman necessarily would have been compelled to do to make the investigation Burns testified the foreman could have made by going to the telegraph office, which was seven miles away, and telegraphing Chicago.

Scott testified: "Worked on same line with Epperson, stringing wires, at the time of injury. It is customary to work with live telegraph wires. I handled same wires that Epperson did. We often got small shocks, but paid no attention to them. That is nothing unusual. There were six live wires on the poles. I didn't hear Epperson make any complaint. I made no complaint. Didn't think it worth while. I felt nothing when I picked up the wires after we came back from the spring. I didn't feel it until I got to the top of the pole. I was knocked off same time Epperson was. There was no lightning rod on my pole, but there was one on Epperson's. Epperson spoke, along in the afternoon—about 2 p. m.—of getting a small shock. I supposed it was from pulling up the wires we were stringing over the live wires on the poles. I was about 200 yards behind Epperson when we fell off. I soon came to. Wasn't hurt much. The shock that knocked me off made a report like a pistol at the time it struck me. I knew what it was at the time. I always did think it was lightning. It was a clear day, but there was a cloud in the northwest. It was a hot, sultry afternoon, and a big thunderstorm came up two or three hours afterwards, at Haughville, about three miles from where accident occurred. There was severe thunder and lightning. I never felt a shock

like that before, and I have had several shocks from wires. The report I heard was a popping, cracking noise, like that you hear when lightning is coming in on lightning arresters on telegraph instruments. I felt a current on that day several times, but I supposed it was pulling the wires we were stringing up over the live wires on the poles. I did not think it worth while to mention it to Terwilliger, as it was a common occurrence. And none of the other boys mentioned it to him, so far as I know. Kaiser and I were tying close together, and we were getting light shocks, but not enough to think of much. I was with the gang tying wires from the start. There was nothing out of condition, and from that day to this I have never heard that there was any cross with electric light or trolley wires, or anything wrong, back of us."

Richards testified: "Was manager of defendant at Kansas City. In the telegraph business eighteen years. Keep batteries on wires all the time when men are repairing or reconstructing the lines. Business is not interrupted. When new wires are added to old line, put batteries on, and use them as soon as important towns are reached. Use the new wires as soon as they are built from town to town. Don't wait until they get clear through. The same current is turned on them as on the other wires. The current used on telegraph wires is not dangerous, but that on electric light and trolley wires is. It is not customary to cut or snub up live telegraph wires when working with them. Men never think of such a thing. If they did cut them they would have to go back and repair them. They would have to handle them in cutting and repairing. Cutting would be no protection. Foreign currents get on telegraph wires by wires breaking and falling on dangerous wires which they cross, or dangerous wires may break and fall on them. Lightning also gets on them from storms. Telegraph instruments are supplied with regular devices for protecting them from the lightning. Lightning is often felt in half a dozen offices at same time."

Redline testified: "Assistant chief operator Western Union Kansas City for nine years. One of the largest offices in the United States. Generally send out current on new lines when nearing point of completion. This is feeling current, and is customary. We keep wires alive right along when men are handling them. New wires are generally connected up and used as the work proceeds. Telegraph wires get hot from cross with other wires, and also from lightning. Bothered during stormy weather with lightning on wires to considerable extent. It travels a great distance on the wires. It is often felt in Kansas City office when there is no appearance of storm here. Our instruments are all provided with lightning arresters. Poles have lightning rods on them, but notwithstanding this fact, lightning travels a great distance on the wires, and often comes into the office when the day is clear here."

Lynch testified: "Foreman telegraph construction gang. Telegraph wires are not dangerous. Are regularly handled with current on. Never cut them when current is felt, although sometimes they get pretty hot, because they are known not to be dangerous. If live wire is picked up by man standing on the ground, he is liable to feel the current, but he is not liable to feel it if he is on a pole. If a live wire is on the ground, it is certain that a man on a pole is not in more danger in handling it than a man would be if handling it on the ground. Currents from telegraph batteries and dynamos are the same—each has little current. Handling a wire on the ground is ordinarily a good test."

Leabo testified: "Was with the gang between Chicago and Indianapolis. At time Epperson was hurt, I was ahead, engaging boarding place. I was about four miles away from the boys at the time of accident. I recollect the weather very distinctly. The accident impressed it upon my mind. The day was very warm and sultry, but clear, until about four or five o'clock in the afternoon, with the exception of those

VOL. 155 mo—24

little white thunderheads which floated across the sky from southwest to northeast. Then it commenced to cloud up very rapidly. About half past two in the afternoon, I was then about two miles from the gang. I was standing on a bridge, seven miles north of Indianapolis, and from one of those little white clouds that was drifting across the country I saw one keen flash of lightning, followed by thunder. And this was before plaintiff was hurt. I saw no more lightning until after Epperson was hurt. Shortly after supper that night there was a very heavy rain, accompanied with wind and lightning. I am not working for the company. Shortly after the accident, I had some correspondence with the plaintiff's attorneys, and the statement I made then was the same I make now. I am not a lineman. I am not well posted in electrical matters. I never heard of snubbing up wires when telegraph current was on simply." Statement made plaintiff's attorneys March 10, 1892, was produced by them, and was introduced in evidence. It corresponds exactly with witness's testimony.

2. In discussing the question of the sufficiency of the evidence as raised by the demurrer thereto, that question will receive discussion from several points of view. Something has been said about there being no plea in the court below of assumption of risk, and therefore that point is not open for consideration in this court. Of this it may be said that evidence showing plaintiff's assumption of risk was not objected to on the part of plaintiff, but to the contrary thereof, was for the most part brought out by plaintiff's counsel from plaintiff himself. More than that, the first instruction asked and given on the part of plaintiff recognized such risk as one of the theories of the case in this way, to-wit: "And the jury further believe from the evidence that the danger from the charged wire was not one that was usually and ordinarily incident to plaintiff's employment." After thus trying the cause on a certain theory in the trial court, it is quite too late for a party to change front in this court, and

repudiate that theory because not expressly pleaded by his adversary. This has been the undeviating doctrine of this court ever since its announcement made in Henslee v. Cannefax, 49 Mo. 295, where plaintiff failed to file a replication, but where the trial had been conducted as if such reply had been filed, and it was thereupon ruled that, a reply having been treated as filed in the lower court, it would be so treated in this court. To the like effect are Howell v. Reynolds Co., 51 Mo. 156; Leabo v. Goode, 67 Mo. 126; Ins. Co. v. Harlan, 72 Mo. 202; Edmonson v. Phillips, 73 Mo. 57; Chouteau v. Gibson, 76 Mo. 38; Meader v. Malcolm, 78 Mo. 550; Young v. Glascock, 79 Mo. 574; Heath v. Goslin, 80 Mo. 310. Touching the point ruled by these authorities, an apt quotation is frequently made by them from PARKER, C. J., who remarked on a similar occasion: "If the parties go to trial upon a full knowledge of the charge, and the record contains enough to show the court that all the material facts were in issue, the defendant shall not tread back, and trip up the heels of the plaintiff on a defect which he would seem thus purposely to have omitted to notice in the outset of the controversy." Slack v. Lyon, 9 Pick. loc. cit. 65. And, altogether apart from mere questions of pleading, this court on frequent occasions has held that it was not admissible for a party, on coming up to this court, to change the trial theory in order to take advantage of such subsequent change. [Trigg v. Taylor, 27 Mo. 245; Bank v. Armstrong, 62 Mo. loc. cit. 65; Brown v. Bowen, 90 Mo. 148; McClanahan v. West, 100 Mo. loc. cit. 322.] These adjudications foreclose plaintiff from taking advantage of defendant's failure to plead plaintiff's assumption of risk.

Another thought which seems pertinent in this connection occurs to me, and I will venture its expression. Ordinarily, it is necessary to plead contributory negligence as a defense, but an exception to this rule takes place where the evidence offered in behalf of plaintiff shows such contributory negli-

gence as will defeat the action. [Schlereth v. Railway Co.,
96 Mo. 509.] I am unable to see why the like rule should not
prevail in parallel circumstances in regard to assumption of
risk. Proceeding, then, upon that theory, it is found prom-
inently set forth and undisputed in the evidence that plaintiff
was an experienced lineman, had had a varied experience in
that capacity in cities and towns for over two years, and conse-
quently could not and did not assert ignorance of the dangers
ordinarily incident to the employment in which he had form-
erly been engaged, and in that in which he was then engaged,
and had been for six months. When a man engages in a
contract of service, the law implies that he takes the risk ordi-
narily incident to such contracts of employment, and whatso-
ever the law implies in a contract is as much part and parcel
thereof as if written therein. [State ex rel. v. Laclede Gas-
light Co., 102 Mo. loc. cit. 485; State v. Gilmore, 141 Mo.
loc. cit. 512, and cases cited.] There has been much discus-
sion of this subject of the assumption of risk, both by this and
other courts, and it may be stated generally that the degree of
the risk is proportionable to the degree of the obvious or appar-
ent danger at the time of entering the employment, and also
to the degree of greater danger which reveals itself in the
subsequent prosecution of the work in which the employee is
engaged, and in which he remains, though apprised of such
additional danger without protest or remonstrance. Indeed,
the doctrine on this subject as announced by the great weight
of authority is broader still than that just laid down, for it em-
braces within its scope not only such risks as are incident, etc.,
but such risks as should become apparent to the employee by
ordinary observation, or are readily discernible by a person of
his age and capacity in the exercise of ordinary care, or where
his means of knowledge are equally as great as those of his
employer, or if he discovers the unusual risks and makes no
complaint. In such circumstances even extraordinary risks
may assume, in legal effect, the shape and proportions of only

ordinary and incidental perils, adding nothing to the liability of the master, and affording the servant no additional grounds for recovery, in the event of injuries received. These positions, it is scarcely necessary to say, are sustained by an abundant array of authorities, both in England and in this country. [Shear. & R. on Neg. (4 Ed.), sec. 185; Hayden v. Manufacturing Co., 29 Conn. 548; Gibson v. Railway Co., 63 N. Y. 449; Wood's Mast. & Serv., p. 758 et seq.; 2 Thomp. Neg., p. 1008; Hewitt v. Railroad, 31 Am. & Eng. R. R. Cas. 249; Moulton v. Gage, 138 Mass. 390; Ladd v. Railroad, 119 Mass. 412; Lovejoy v. Railroad, 125 Mass. 79; Hulett v. Railroad, 67 Mo. 239; Smith v. Railway Co., 69 Mo. 32; Kean v. Rolling Mills, 66 Mich. 277; McGinnis v. Bridge Co., 49 Mich. 466; Hathaway v. Railroad, 51 Mich. 253; Railroad v. Gildersleeve, 33 Mich. 133; Davis v. Railroad, 20 Mich. 105; Railroad v. Love, 10 Ind. 554; Railroad v. McCormick, 74 Ind. 440; Whittaker's Smith on Neg., secs. 131, 133; Darracutts v. Railroad, 31 Am. & Eng. R. R. Cas. 157; Beach, Contrib. Neg., secs. 138, 139; Lockwood v. Railway Co., 55 Wis. 50; Hutchinson v. Railroad, 5 Exch. 343; Skipp v. Railroad, 9 Exch. 223; Assop v. Yates, 2 Hurl. & N. 768; Williams v. Clough, 3 Hurl. & N. 258; Gaffney v. Railroad, 15 R. I. 456.] Judge THOMPSON, as cited above, states the dominant rule in this class of cases thus: "If the servant, before he enters the service, knows, or if he afterwards discovers, or if, by the exercise of ordinary observation or reasonable skill and diligence in his department of service, he may discover that the building, premises, machine, appliance, or fellow servant in connection with which or with whom he is to labor is unsafe or unfit in any particular, and if, notwithstanding such knowledge, or means of knowledge, he voluntarily enters into or continues in the employment without objection or complaint, he is deemed to assume the risk of the danger thus known or discoverable, and to waive any claim for damages against the master in case it shall result in injury to him."

In Railroad v. Love, 10 Ind. 554, it is announced "that, where both parties have equal knowledge, and the servant continues in the service, each party takes the risk." The Supreme Court of Connecticut, on this subject, thus gives expression to its views: "Every manufacturer has a right to choose the machinery to be used in his business and to conduct that business in the manner most agreeable to himself, provided he does not thereby violate the law of the land. He may select his appliances, and run his mill with old or new machinery, just as he may ride in an old or new carriage, navigate an old or new vessel, or occupy an old or new house, as he pleases. The employee having knowledge of the circumstances, and entering his service for the stipulated reward, can not complain of the peculiar taste and habits of his employer, nor sue him for damages sustained in and resulting from that peculiar service......Doubtless it is true that no man may, in conducting business, unnecessarily and wantonly disregard the rights of other people, whether employees or strangers; but such is not the case before the court. An employee having knowledge can not claim indemnity except under particular circumstances. He is not secretly or involuntarily exposed, and likewise is paid for the exact position and hazard he assumes; and so he may terminate his employment when, from unforseen perils, he finds his rewards inadequate or unsatisfactory." [Hayden v. Manufacturing Co., 29 Conn. loc. cit. 558.] To the same effect, see Skipp. v. Railroad, 9 Exch. 223. In a recent work of merit these rules are laid down as proper deductions from authorities previously discussed: "First. The master may conduct his business in his own way, though such method may be more than ordinarily hazardous, thereby increasing the risks and peril. Second. The servant assumes the risk of the extra hazards and perils by continuing in the employment, where he has knowledge of the master's methods, either actual or presumed. Third. Those extra hazards which thus become known to the employee enter into

and become a part of the contract.   Fourth.   Where the defect is obvious, knowledge is presumed, on the part of such employee, of the dangers which it suggests, and which are apparent.   Fifth.   The master may rest upon the assumption that the servant knows what is generally to be seen, by his observation, suggesting the danger.   Sixth.   The servant must exercise ordinary care to learn the dangers which he may have to encounter.   These considerations control the general rule of the master's duty to furnish a reasonably safe place to work, and reasonably safe appliances for the performance of the work, and qualify the legal presumption 'that the servant may assume that this duty on the part of the master has been performed,' to the extent that he may not thus assume, where he knows, or ought to know, that such duty has not been done, and was not contemplated in making the contract of service. The contract, therefore, must be that risks and perils obvious to a person of ordinary understanding are embraced therein, and assumed by the servant, when the opportunity has existed for observation." [Bailey, Mast. Liab., pp. 180, 181.]   The Supreme Court of Maine has said:   "It is the duty of the servant to exercise care to avoid injuries to himself.   He is under as great obligation to provide for his own safety, from such dangers as are known to him, or are discoverable by ordinary care on his part, as the master is to provide for him......He must take ordinary care to learn the dangers which are likely to beset him in the service.   He must not go blindly to his work when there is danger.   He must inform himself. This is the law everywhere."   [Wormell v. Railroad, 79 Me. 405.]   In Stuart v. Manufacturing Co., 43 N. E. Rep. 962, the appellate court of Indiana, when speaking of the case of a servant injured while obeying the direct orders of the manager to proceed to the place where he was almost immediately injured while doing the work assigned him, said:   "Another rule, equally familiar as the one requiring the master to furnish his servant a safe place to work, is that, when a servant of

mature years and understanding enters into the employment which is necessarily hazardous, he will be presumed to have taken all the ordinary risks incident to such service, and the fact that the service is naturally a dangerous one does not increase the master's liability if the injury results from the natural and ordinary incidents of the undertaking. If there is a defect in the machinery or appliances that renders the work of the servant more hazardous, and that defect is open and obvious, or can, by the exercise of ordinary care, be discovered by the servant, but is disregarded, the risk becomes one of the assumed risks of the service, and liability therefor is waived. [Myers v. W. C. De Pauw Co., 138 Ind. 590; Salem Lime Co. v. Griffin, 139 Ind. 141; Railroad v. Henderson (Ind. Sup.), 42 N. E. Rep. 216; Salem Stone Co. v. Hobbs, 11 Ind. App. 27; City of Lebanon v. McCoy, 12 Ind. App. 500]." This case arose in New Jersey: The plaintiff while in the service of the defendant company was called upon to ascend one of the poles for the purpose of trimming a lamp. One of the steps used for climbing the pole was broken off, which the plaintiff saw. He ascended safely, but in descending his foot slipped when he reached the broken step, causing him to fall, by reason of which he was injured. He recovered judgment in the lower court. In passing on the case thus presented, the court said: "If the servant knows of the defect, and it is of such a nature that a prudent person will not abandon the service on account of it, then no negligence can be charged to the master for permitting the defect to continue. If the plaintiff was justified in concluding that he could ascend the pole and return with safety by using extra care, the defendant had the right to draw the same conclusion; and in that event the defendant was in no fault. If the peril was of such imminent character that it was imprudent on the part of the plaintiff to attempt to ascend the pole, then, under the rule laid down by the trial judge, the verdict is wrong. If the plaintiff acted as a prudent man in undertaking to ascend the pole, the injury must be

ascribed to mere accident......In that case neither he nor his employer is to be held guilty of a want of care. The servant and the master had equal means of forming a correct judgment. Therefore whatever want of prudence in taking the risk is chargeable to the one must be imputed to the other.... The immunity of the master rests upon the contract of hiring......The master says to the servant, 'You understand fully the nature of the employment, and the danger attending it. Will you enter upon it?' The servant says, 'I accept it;' and the law implies that he accepts it with all the risk incident to it, without regard to the magnitude of the danger." [Foley v. Light Co., 24 Atl. Rep. 487.] The Supreme Court of Wisconsin was called upon to decide the following case: "The proof showed that the plaintiff was a man thirty-seven years of age, and of ordinary intelligence; that he had been employed laying and calking pipe for waterworks contractors, 'off and on,' for several years and in several cities; that when not engaged in this business he worked as a common laborer; that he had noticed trenches cave in a number of times in other places, and three times at Rice Lake, the last time being about ten minutes before he was hurt; that he knew trenches not braced were liable to cave in, from experience; that the soil where the trench caved in was a clay soil, about eighteen inches in thickness, with sand and gravel beneath; and that the digging crew was about three rods ahead of plaintiff and Simmons, and a few minutes before the accident some sand fell from the side of the trench where the diggers were at work. When this happened, the digging crew left the trench, and plaintiff and Simmons also got out, because they were afraid it would cave in. The superintendent, Elder, and a foreman, were on the ground when the plaintiff got out of the ditch. The foreman said he would not be afraid to lie down in the ditch all night, and would do so for a dollar and a half. Mr. Elder said: 'Boys, go back to the ditch, and lay up to where the shovels are, about three or four lengths. The ditch is perfectly safe. Go back and go to work. I will go

right down to the office, buy lumber and have it braced and curbed up.' Upon this, plaintiff and Simmons went back to work, because as plaintiff says: 'I took Mr. Elder's word. I thought he had more experience than I had, and I felt the bank was perfectly safe. I took Mr. Elder's word.' After they had been at work about ten minutes, the trench caved in, inflicting the injuries of which plaintiff complains. Upon these facts we are clearly of the opinion that the plaintiff must be held to have assumed the risk. He was of ordinary intelligence. He knew that trenches of this depth were liable to cave in. He knew that this very trench had just partially caved in at a distance of a few feet. He came out of the ditch because of that very fact. He knew all the facts which the superintendent knew, and had fully as much experience as the superintendent. No expert engineer could have given him any additional information as to the probability of the ditch caving in. In fact, he was fully informed of the peril and chose to continue his work. No principle is better established than that under such circumstances the risk is assumed. [Naylor v. Railway Co., 53 Wis. 661, 11 N. W. Rep. 24; Johnson v. Water Co., 77 Wis. 51, 45 N. W. Rep. 807; Paule v. Mining Co., 80 Wis. 350, 50 N. W. Rep. 189.] But is said that the assurance of safety given by the superintendent, and the command to return to work, relieved the plaintiff of the consequences of the assumption of risk. This is not the case where the employee is of full age and capacity, and knows the danger as fully as the superintendent. [Toomey v. Steel Work (Mich.), 50 N. W. Rep. 850; Lynch v. Manufacturing Co., 143 Mass. 206, 9 N. E. Rep. 728; Kean v. Rolling Mills (Mich.), 33 N. W. Rep. 395; Bradshaw's Adm'r v. Railroad (Ky.), 21 S. W. Rep. 346.] Plaintiff had the right to refuse to obey the order, and, if he chose to obey, he took the risk, of which he had full knowledge." [Showalter v. Fairbanks, Morse & Co., 60 N. W. Rep. loc. cit. 257.]

Fugler v. Bothe, 117 Mo. 475, was certified to this court

from the St. Louis Court of Appeals. In that case the deceased, an experienced carpenter, had been working for three weeks boarding air shafts. He had finished three of them, standing on a gutter on the inside of the shaft. Before commencing on the first shaft, the deceased and another carpenter (Schmidt) under the orders of defendants' foreman, began to erect a scaffold for the purpose of doing the work. One of the defendants forbade the construction of the scaffold, and told the workmen they "could either do the work by standing on the gutter or they could quit." The deceased, while at work on the fourth shaft, and while standing on the gutter, lost his balance, and fell to the floor below, and received injuries which caused his death. Held that, the danger being obvious and continuous, the deceased assumed the risk, and the master was not liable. The court adopted the dissenting opinion of ROM-BAUER, J., filed in the St. Louis Court of Appeals. Judge ROM-BAUER reviewed most of the cases decided by this court up to that time, and distinguished some of them from that case by the following observation, which is pertinent to the case at bar. He says (page 500, 117 Mo.): "The great difference between all of these causes and the case at bar is, that here the unavoidable inference arises from the uncontrovertible facts that the servant not only knew the defect, if such it may be called, but also knew the attendant and continuous danger arising from it to him, much better than the master could possibly know it. It was the servant and not the master who continually moved on the plank and knew whether he could safely handle his body upon it without losing his balance." A case nearly approaching the present one in some of its features is that of Junior v. Power Co., 127 Mo. loc. cit. 82. In that case it is said, in the opinion delivered per GANTT, P. J.: "The negligence of which plaintiff complains here is the failure of defendant's foreman, in charge of the squad of men who were to make the connection of defendant's electric plant with the butcher shop on the Manchester road, to caution plaintiff's

husband in regard to the exposed condition of the ends of these two wires. The evidence shows beyond cavil that the plaintiff's husband was an experienced lineman; that he had worked for defendant in this capacity for several years; that he had also worked for other electric companies; the evidence shows that deceased ascended the pole alone that day to make the connection; that it was broad daylight; that two 'live wires' of the defendant were devoid of insulating material at their extreme ends for the space of one-eighth or one-sixteenth of an inch; and that deceased sat upon a cross-arm of the pole, preparing to connect a wire for the butcher shop with these ends; that the fact that these two ends of the wires were not insulated was open and obvious, and could not only be seen by one in the close proximity thereto of the deceased at that time, but both Baldwin and Baurman testify that they saw the two exposed ends from their position on the ground, thirty feet distant; Baldwin was a brother-in-law of the deceased. It appeared that deceased was an experienced lineman, understood his business, and that the lineman were the only employees of defendant who went on the poles and handled, connected, and repaired the wires thereon and the only employees who had an opportunity to inspect and know the condition of the wires; the testimony of the brother-in-law, the foreman of the squad, was that he did not caution the deceased that the ends of the wires were exposed that day because it was not only open and obvious, but it was the peculiar business of deceased to see and know that, and the connection was to be made with these wires. . . . . . . . There were six arms on the pole upon which he had climbed, on which were strung the wires of the telephone and telegraph companies and of the fire alarm service, all charged with electricity, and all uninsulated. . . . . . . . The facts of this case bring it within the familiar principle that if a servant, capable of contracting for himself, and with full notice of the risk he may run, voluntarily undertakes a hazardous employment, or to place himself in a haz-

ardous position, or to work with defective tools or appliances, the master is not liable for injuries received from these known risks.    It often happens that both natural and artificial persons are engaged in exceedingly dangerous business, and, if it is not unlawful, may employ servants to perform dangerous duties, and yet not be liable to its servants for injuries received therein, if the servants are capable of contracting, and know the risks attending the business.    The handling of live wires is a most dangerous business, but plaintiff's husband knew that when he entered into the employment.    He was not a minor, nor an inexperienced workman, to whom the dangers of the business were unknown.    The danger to which he was exposed was open and obvious.    He was as cognizant of the danger, if not more so, than the foreman, and the failure to caution him can not avail where he is as well acquainted with the hazard as his employer."    See, also, Steinhauser v. Spraul, 127 Mo. 541.

These authorities, and the principles they declare, when applied to the facts of the case at bar, only conduce to but one result, and that result unfavorable to plaintiff.    He, too, was an experienced lineman, and could not help being apprised of the dangers of the situation, either from experience gleaned in another field, or from his present and more recent labors.    There seems to be no doubt that he was more experienced that Terwilliger, the foreman; but, under the rule heretofore quoted, if his knowledge only equaled that of the foreman, then plaintiff took his own risk.    Besides, all that the foreman assured him was as to an existing state of facts. There was no assurance of the future.    Indeed, the petition itself states:  "Said foreman . . . . . . . thereupon told the plaintiff that he did not feel anything in the wire at that time." Having made this statement in his petition, it was out of plaintiff's power to gainsay that allegation by any evidence that could be adduced, and so any evidence offered for that purpose must be held for naught.    This has been the rule in this State

ever since Bruce to use v. Sims, 34 Mo. 246; Bank v. Armstrong, 62 Mo. 59; Chapman v. Callahan, 66 Mo. loc. cit. 312; Lenox v. Harrison, 88 Mo. loc. cit. 495; Weil v. Posten, 77 Mo. loc. cit. 287; Wilson v. Albert, 89 Mo. loc. cit. 546. And it is impossible to suppose that plaintiff could have relied on what the foreman said, because he felt the current again before he took the wires out of his belt, and therefore knew that the current had reappeared. Yet, notwithstanding this, he took the wires out of his belt, and, disregarding all the ordinary dictates of former experience and present prudence, he proceeded to tie the wires, and received the injury complained of. In such circumstances, being fully apprised of the danger himself, he will not be permitted to say that he relied on the previous assurances of the foreman. Moreover, the evidence does not show what it was that caused the current of the electricity to be on the wire—whether it resulted because the wires being strung were crossed with others, or whether from lightning. Much of the testimony tended to show that it was the latter, and there was no dispute that all the conditions were favorable to the theory that it was lightning that caused the injury. In such circumstances we are confronted by the rule which declares that, where an action is brought for damages which are occasioned by one of two causes, for one of which defendant is responsible and for the other not, the plaintiff is fated to failure if his evidence fails to show that the damages were produced by the former, or if, from the evidence, the probabilities are equally strong that the damages were caused by the one as by the other. [Searles v. Railway Co., 101 N. Y. 661.] This principle finds recognition in Priest v. Nichols, 116 Mass. 401; Smith v. Bank, 99 Mass. 605; Breen v. Cooperage Co., 50 Mo. App. 202; Marble v. Worcester, 4 Gray 395; Fuchs v. St. Louis, 133 Mo. loc. cit. 196, 197. This action being for negligence, the affirmative is on plaintiff to establish it. In the language of the Supreme Court of Wisconsin: "Judicial determinations

must rest upon facts, and legal liability must be determined by the law in application to the facts. These rules will not exclude circumstantial evidence, for such evidence is often the strongest, but such evidence, after all, must establish facts. When liability depends upon carelessness or fault of a person or his agents, the right of recovery depends upon the same being clearly shown by competent evidence; and it is incumbent upon such a plaintiff to furnish such evidence to show how and why the accident occurred—some fact or facts by which it can be determined by the jury, and not left entirely to conjecture, guess, or random judgment, upon mere supposition, without a single known fact." [Sorenson v. Pulp Co., 56 Wis. 338.] For these reasons it must be held that defendant's demurrer to the evidence was well taken, that the facts in the record established no cause of action, and that the judgment should be reversed.

*Robinson* and *Marshall, JJ.,* concur. *Brace, J.,* concurs in the result, holding that the evidence discloses no negligence on the part of defendant. *Gantt, C. J.,* concurs in the opinion, but not in the rule announced by DAY, J., in Griffith v Docks Co., 12 Q. B. Div. 493, if that case limits the master's liability to an actual knowledge of the danger, holding that the master is equally bound if, by the exercise of ordinary care, he could have ascertained and avoided the danger to the servant; nor in Showalter v. Fairbanks, Morse & Co. (Wis.), 60 N. W. Rep. 257. *Burgess, J.,* absent. *Valliant, J.,* not sitting.

### SEPARATE OPINION ON REHEARING.

GANTT, C. J.—A motion for rehearing has been filed and argued at great length by the respondent. It is earnestly insisted that in the opinion of the court we have repudiated a long line of decisions without expressly overruling them. I did not concur in so much of the opinion as I conceived

asserted the master's liability only for those defects and dangers in the appliances furnished by him to his servant, of which he had knowledge. As I understand the settled law of this State and in this court it is primarily the duty of the master to furnish his servant a reasonably safe place in which to work, and reasonably safe appliances with which to work, and he is liable for injuries to his servant from his failure to do so, not only for those defects of which he has actual knowledge, but also for those latent defects which by the exercise of ordinary care he could have discovered, and not only is it his duty to use reasonable care to see that they are safe and fit for the work in hand when furnished but it is his duty to use like care and precaution to see that they are kept in good order and condition. If the master does not know of the defect, and reasonable care on his part would not have disclosed it, he is not liable, but if reasonable care would have disclosed it, then he is liable for injuries to the servant therefrom, though it was not actually known to him. [Porter v. Railroad, 71 Mo. 66; Nichols v. Crystal Plate Glass Co., 126 Mo. 55; Bender v. Railroad, 137 Mo. 240; Helfenstein v. Medart, 136 Mo. 595.]

When one enters into the service of another he assumes the ordinary risks arising within the scope of that employment, but he does incur thereby extraordinary risks. Mere knowledge of the defective appliance by the servant will not absolve the master for his neglect to supply safe appliances, but the settled law of this State is that notwithstanding the defect is brought to the knowledge of the employee, yet if he reports it to the master, and the master promises to repair the defect or remove the danger, the servant can recover for an injury caused thereby within such time as it would be reasonable to allow the master for its performance. [Conroy v. Vulcan Iron Works, 62 Mo. 35; Keegan v. Kavanaugh, 62 Mo. 230; Stephens v. Railroad, 96 Mo. 207; Holmes v. Clarke, 6 Hurl.

& N. 349; Clarke v. Holmes, 7 Hurl. & N. 937; Holloran v. Union Iron Co., 133 Mo. 470.]

The mere fact that the master and the servant have equal opportunities to discover the defect, will not defeat the recovery by the servant, if the defect was unknown to the servant, and the ordinary care on the part of the master would have revealed the defect for the reason that it is not the duty of the servant to look for latent defects, whereas it is the master's duty to use reasonable care to see that his appliances are kept in good order and condition. [Nichols v. Crystal Glass Co., 126 Mo. 55.]

If a master's personal knowledge of defects in his machinery and appliances were necessary to his liability the more he neglected his business and abandoned it to others, the less liable he would be. It is also settled that knowledge of a defect will not defeat a servant, but it must be knowledge of the risk or danger, nor will mere knowledge that there is danger in working with the appliances furnished by the master defeat his action, if the danger was not so glaring as to threaten immediate injury, or if it was reasonable to suppose that he could use the same safely by the exercise of ordinary care. [Stoddard v. Railroad, 65 Mo. 514; Devlin v. Railroad, 87 Mo. 545; Huhn v. Railroad, 92 Mo. 440; Hamilton v. Rich Hill Coal Co., 108 Mo. 364; Mahaney v. Railroad, 108 Mo. 201; Soeder v. Railroad, 100 Mo. 673.]

In my opinion the adjudications of this court are not in harmony with the decisions of the Indiana and Wisconsin supreme courts, cited with approval by Judge SHERWOOD.

On the contrary, this court has aligned itself with that of Pennsylvania, the Supreme Court of the United States, and many others which hold that if the instrumentality with which the servant is required to perform his services is so obviously and immediately dangerous that a man of common prudence would refuse to use it, the master can not be held liable for the resulting damage.

In such case the law adjudges the servant guilty of concurrent negligence and will refuse him that aid which he otherwise would be entitled to. But where the servant in obedience to the requirement of the master incurs the risk of machinery which, though dangerous, is not so much so as to threaten immediate injury, or where it is reasonably probable it may be safely used by extraordinary caution or skill, the rule is different. [Francis v. Railroad, 127 Mo. 669; Hamilton v. Rich Hill Coal Co., 108 Mo. 375; Huhn v. Railroad, 92 Mo. 440; Patterson v. Railroad, 76 Pa. St. 389; Railroad v. Mares, 123 U. S. 710.]

In this case the petition counts upon an order of the foreman of defendant, requiring plaintiff to ascend a telegraph pole and tie certain wires thereon, which wires it is charged contained a dangerous current of electricity, that the foreman knowing the wires had immediately before contained said dangerous current of electricity, negligently ordered plaintiff to pick them up, ascend the pole, and tie them.

It was conceded by all parties that the work in which plaintiff was employed was not hazardous under ordinary conditions. The wires he and his fellow servants were stretching were what is known as dead wires, and these wires were supposed to be free of an electrical current. It seems, however, that it is customary, when a new line is being constructed, as this was, for the operator at the initial point to test the line from time to time, to ascertain if it is finished. The current thus used is not dangerous.

As stated in the opinion filed herein, there is no charge that the defendant was in any manner guilty of negligence in the construction of these new lines, or that there was any defect in them or in any of defendant's electrical apparatus. On the contrary, the force of which plaintiff was a member was engaged in putting up new wires upon poles already erected and no question is made of the proper disposition of the arms which were to receive the wires. Nor, again, is there

any charge that the electrical current which knocked plaintiff off of the pole, entered the wire through any negligence of defendant.

The negligence charged is narrowed down to the one act of directing plaintiff to proceed with hanging the wires, knowing or negligently failing to know the wires were charged with a dangerous current, at the time.

This line had been built from Chicago to a point seven miles north of Indianapolis. No current of electricity had been encountered until the morning of the day of the accident. About nine o'clock that morning the plaintiff says he noticed a current of electricity in the wires while handling them and said to the foreman "that there was either a cross-up with some wires or they had turned the current on us." Whereupon the forman said, "It is about time they were getting to their offices, and very likely they are feeling for us and if you feel it any more let me know it, and I will send a man back to see where the trouble is."

The plaintiff continued work, and the current was not felt again until about eleven o'clock, and he says he notified the foreman when he came along, but the foreman said nothing and plaintiff continued at his work until noon, without further trouble. How strong or how dangerous the current was at eleven o'clock plaintiff did not advise the foreman.

Evidently neither thought it at all dangerous, and it did not return again until four o'clock in the afternoon. One thing is beyond controversy and that is that plaintiff knew more about the intermittent current than the foreman did. He it was who gave the foreman all his information. Plaintiff testified he did not think it was dangerous, that "nobody said it was dangerous." If nothing more had intervened surely it could never have been said that the foreman had ordered plaintiff into a dangerous place or to work with dangerous appliances because the proof as to the conditions up to noon failed to show a situation of danger.

But in truth this case must rest upon what occurred about four o'clock in the afternoon. When the linemen returned to their work in the afternoon from the spring, plaintiff took up the three wires and put them in his belt and began to ascend the pole, and when he had gone up about three or four feet he again felt a current of electricity, and came down the pole and threw down the wires and said to the foreman, "These wires are too hot for any man to handle with satisfaction and I will not handle them as long as Chicago is feeling for us." The foreman immediately went to plaintiff, took up the wires in his bare hands, and held them for a few minutes, and said to plaintiff, "Tom, I don't feel anything on these wires; they are all right, go ahead." Plaintiff then picked up the wires again and started up his pole. He says when he picked them up there was no current of electricity in them. He felt no current until he had reached the cross-arm, on which he was to tie the wires. He felt it again then, but proceeded to tie them, and failed to notify the foreman.

The plaintiff's evidence shows that he had been engaged two years in repairing live wires, and six months as lineman. His testimony discloses he fully understood all the dangers of the service, and he now says the inspection made by the foreman was insufficient because the wires were lying on the ground when he took them in his hands. The gravamen of plaintiff's petition is that the foreman ordered plaintiff into a situation of danger, and plaintiff acted on the assurance of the foreman and was not free to act on his own knowledge of the danger.

I agree that it is the settled law of this State that it is the duty of the master, where the servant is engaged in a hazardous employment, to use every reasonable precaution to insure the safety of the servant. If the employment is such that the risk is not obvious, and it is fair to presume the servant has not been guilty of any negligence on his own part the master is responsible. [Keegan v. Kavanaugh, 62 Mo. 230; Shortel v. St. Joseph, 104 Mo. 114.] But if a servant

goes into a place so obviously dangerous that a prudent man under the same or similar circumstances would not obey the order he is guilty of such contributory negligence as will defeat a recovery.    [Shortel v. St. Joseph, *supra*; Keegan v. Kavanaugh, *supra*.]

Applying these principles, it must be conceded, we think, that ordinarily, stringing "dead wires" is not a hazardous business.

Did the proof show in this case that the foreman had up to four o'clock of the day of the injury become aware that the work had become hazardous?  We think not.   Plaintiff's own testimony was to the effect that he had suggested to the foreman that the operator at the Chicago office was "feeling" for them.   He testifies, as did all the others, that the current thus sent out was not dangerous.   After noticing it at nine o'clock and having been directed to tell the foreman of the recurrence, he did not feel it again until 11 o'clock and though he reported it, he did not himself think it dangerous nor did any of his fellow workmen.   Until four o'clock, then, no one claimed to be aware of a dangerous current.   He then said it was too hot to work with satisfaction.   It then became the foreman's duty to inspect the wires.   This he did at once, and gave a supreme test.   He took the wires in his bare hands, and held them several minutes, and felt no current.

Conceding as I do, that the duty rested upon the master to use reasonable care to provide the servant safe appliances with which to work, I am not able to find wherein defendant failed of this duty.   It furnished new wires, safe poles, and arms on which to string the wires; it is not charged that by any negligence of its own, the live current got into the wires. Under such circumstances it seems to me nothing was wanting to fill the measure of its duty, except proper inspection to maintain the conditions it had created.   It had no notice of a change, save from plaintiff who discovered a current that he attributed to what he called "feeling" by the Chicago office,

but this was not deemed dangerous, until four o'clock. An inspection was then called for. Whether it was proper must be determined with reference to the existing state of affairs. The plaintiff thought it too strong to do satisfactory work. Appealed to, the foreman took the wires in his bare hands and held them several minutes. If they had been charged with a dangerous current he would have forfeited his own life. That he did not think the current was dangerous is evidenced by this act. He found no current, and plaintiff affirmed this test. It satisfied both at the time. Plaintiff did not demand any further test but resumed his work.

Did the foreman use ordinary care to ascertain whether there was a dangerous current in the wires? As already said he at once took up the wires and held them in his hands and could discover no evidence of electricity in them. He stated the result of his examination and plaintiff also tested them again and concurred in that statement. Had the foreman discovered a current and then ordered plaintiff to proceed, there would be room for the argument of plaintiff, but he did not. Did this amount to a guaranty that it would not again appear, and if it did, to ignore it as it would not be dangerous? Certainly not. He simply told him it was all right then, and in no way invited plaintiff to proceed if he afterwards found the wires were dangerously charged. There was no promise to repair or remove the cause because the foreman did not know how the current got into the wires. Wherever it came from, it had disappeared as in the morning. The foreman had risked his own life in testing the wires. In this respect he was unlike the employer in Keegan v. Kavanaugh, *supra*. He gave the highest proof of his own belief that the wires were safe. It seems to us that there can be no doubt this was the exercise of ordinary care under the circumstances. There was, then, neither failure to inspect the wires, nor a positive order to go into a known place of danger.

Taking into consideration the age of plaintiff, his long

experience in handling electric wires; his knowledge of the danger from live wires; his information that the current had been in the wires that day, and his subsequent discovery of its return after he had ascended the pole and his continuing to work with said wires without further notice to the foreman, who had not the same opportunity to discover the danger, it must be held that he voluntarily assumed the increased risk, and that his disregard of his own safety brought about his injury, and he can not recover.

This conclusion in my opinion, does not militate against the former decisions of this court, but it is not in line with some of the authorities cited in the opinion of the court, with which as already said, I do not agree, but leads me as before to a concurrence in the result reached by Judge SHERWOOD in his opinion.